UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 08-50100-01 |
| Plaintiff, | RESPONSE TO DEFENDANT'S SUPPLEMENT TO PRO SE MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A) (DOCKETS 390, 395) |
| vs. | |
| KEVIN WALKING EAGLE, | |
| Defendant. | |

---

The United States, by and through Assistant United States Attorney Heather Sazama, files this response opposing Defendant's Pro Se Motion for Compassionate Release and Supplement to Pro Se Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i).

## FACTUAL BACKGROUND

Defendant Kevin Walking Eagle is serving a 240-month sentence at Federal Correctional Institution ("FCI") Englewood, in Littleton, Colorado[1], with an anticipated release date of October 31, 2025, for his conviction of engaging in a Continuing Criminal Enterprise, in violation of 21 U.S.C. §§ 848(a) and 848(c). https://www.bop.gov/inmateloc/ (BOP register number 10423-273); Doc. 285 at 1; Doc. 392 at 801. Defendant is 47 years old. As of July 31, 2020, he has served approximately 58.9% of his 240-month sentence. Doc. 392 at 802.

---

[1] FCI Englewood has had five inmates and zero employees diagnosed with COVID-19. Four inmates and one employee have been listed as recovered from COVID-19, and no inmates or staff have died as a result of COVID-19. https://www.bop.gov/coronavirus/ (last accessed July 29, 2020).

Defendant's 240-month sentence reflects the statutorily-required mandatory minimum sentence for his crime.  21 U.S.C. § 848(a).

Defendant seeks relief based on compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Docs. 390, 395.  Defendant asks the Court to reduce his sentence to time served and, if the Court deems necessary, to a period of home confinement as a condition of supervised release.[2]  Doc. 395 at 1.  The United States opposes Defendant's motion.

## ARGUMENT

## I.   DEFENDANT'S MOTION SHOULD BE DENIED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—
(1) in any case—

---

[2] BOP has exclusive authority to determine the location where an inmate serves his or her custodial sentence, including whether transfer from a secure facility to home confinement is more appropriate for a particular defendant.  *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].");  *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence.");  *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate all federal penal and correctional institutions.").  Although this Court may make a non-binding recommendation to BOP as to home confinement, BOP's designation decision "is not reviewable by any court." 18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g., United States v. Jones*, No. CR 17-070 VC, Doc. 93 (N.D. Cal. Apr. 10, 2020) (denying defendant's motion for compassionate release but recommending BOP place defendant in home confinement); *United States v. Fobbs*, No. 19-CR-410 WHA, Doc. 32 (N.D. Cal. Apr. 7, 2020) (recommending BOP place defendant in home confinement).

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A).  This section "imposes a requirement on prisoners before they may move on their own behalf: They must 'fully exhaust[] all administrative rights' or they must wait for 30 days after the warden's 'receipt of his request.'" *United States v. Alam*, No. 20-1298, 2020 WL 2845694 at *2 (6th Cir. June 2, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).  This is a mandatory claim-processing rule and, "[b]ecause 'Congress sets the rules' when it comes to statutory exhaustion requirements, the judiciary has a role to play in exception-crafting 'only if Congress wants [it] to.'" *Id.* at *3 (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1857, 195 L. Ed. 2d 117 (2016)). "Nothing in § 3582(c)(1)(A) suggests the possibility of judge-made exceptions." *Id.*

The exhaustion requirement should be upheld, even in cases where a defendant claims his health issues, the global pandemic, or both, compel a different result.  *United States v. McCloskey*, No. 4:18-CR-260, 2020 WL 3078332, at *4 (S.D. Ga. June 9, 2020) (upholding exhaustion requirements where defendant was 48 years old, suffered from Type 1 insulin-dependent diabetes, had hypertension, and had survived a previous heart attack).  "While these health conditions are not trivial, they do not rise to the level of age and

health conditions that have compelled courts to waive Section 3582(c)(1)(A)'s exhaustion requirement." *Id*.

Other courts in this district have held that the 30-day waiting period before judicial review of a motion is permitted under 18 U.S.C. § 3582(c)(1)(A) runs 30 days from the date the warden receives a defendant's request. *See, e.g., United States v. Brunston*, 4:18-CR-40145-KES, Doc. 68, at 4 (D.S.D. May 26, 2020). Courts in other districts, however, have ruled otherwise. "[I]t does not matter whether section 3582(c) is a jurisdictional statute or a non-jurisdictional claim-processing statute, because its exhaustion requirement is clearly statutory and therefore mandatory." *United States v. Ng Lap Seng*, No. S5 15-CR-706 (VSB), 2020 WL 2301202, at *5 (S.D.N.Y. May 8, 2020). "[W]hether the statute is jurisdictional or a claim-processing rule, its exhaustion requirements are clearly mandatory." *United States v. Ogarro*, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020)

The Supreme Court has instructed that a mandatory exhaustion requirement cannot be ignored, "even to take 'special circumstances' into account." *Ross*, 136 S. Ct. 1850, 1853. The COVID-19 pandemic, while presenting urgent and serious concerns, does not allow this Court to circumvent the statute's administrative requirements. Bypassing statutory exhaustion requirements defies explicit Supreme Court precedent and would have lasting impacts beyond the present pandemic. Numerous courts have recognized that COVID-19 does not excuse the administrative requirements of 18 U.S.C. §

3582(c)(1)(A).  *See, e.g., United States v. Reid*, No. 17-cr-00175-CRB-1, Doc. 547 (N.D. Cal. Apr. 18, 2020) (holding the court lacked jurisdiction to review defendant's claim for compassionate release until administrative remedies were exhausted); *United States v. Fischman*, No. 16-cr-00246-HSG-1, Doc. 68 (N.D. Cal. Apr. 22, 2020) (holding motion in abeyance until 30 days elapsed after inmate's request to warden); *United States v. Catledge*, No. 12-cr-00678-MMC-1, Doc. 433 (N.D. Cal. Apr. 16, 2020) (denying COVID-19-based compassionate-release motion for lack of exhaustion); *United States v. Hembry et al.*, No. 12-cr-00119-SI-1, Doc. 1723 (N.D. Cal. Apr. 10, 2020) (same); *United States v. Eberhart*, No. 13-CR-00313 PJH, Doc. 64, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (same); *United States v. Robinson*, No. 18-CR-00597 RS, Doc. 29 (N.D. Cal. Mar. 24, 2020) (same).  Although "it is indisputable that the COVID-19 outbreak is unprecedented and poses a heightened risk to those in this nation's prisons and jails, [] absent congressional action to relieve inmates of the exhaustion requirement [of Section 3582(c)(1)(A), this Court] is unable to provide the relief Defendant seeks."  *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *10 (D. Or. Apr. 6, 2020).

To exhaust administrative remedies, a defendant must initiate a request in writing to the warden of his institution detailing "the extraordinary or compelling circumstances that the inmate believes warrant consideration" and the inmate's "proposed release plans" with several necessary details. 28 C.F.R. § 571.61 (implementing Section 3582(c)(1)(A)).  BOP's Program Statement sets

forth procedures for implementing Section 3582 and states: "A request for a RIS is considered 'submitted' for the purposes of 18 U.S.C. § 3582(c)(1), when received by the Warden in accordance with this section." *See* https://www.bop.gov/ policy/progstat/5050_050_EN.pdf.  Defendant, through counsel, submitted his request to the warden of FCI Englewood just ten days ago, on July 21, 2020.   Doc. 395-1.   Based on the foregoing authority, Defendant's motion should be denied for failure to exhaust administrative remedies.  Alternatively, the United States asks the Court to hold the motion in abeyance until 30 days have elapsed from the date Defendant submitted his request to the warden of his facility.

## II.   RELEASE IS NOT JUSTIFIED UNDER THE COMPASSIONATE RELEASE STATUTE, THE RELEVANT SENTENCING FACTORS, AND THE APPLICABLE UNITED STATES SENTENCING GUIDELINES.

### A. APPLICABLE LAW.

Should the Court address the merits of Defendant's motion, a sentence reduction is nevertheless unwarranted under the compassionate release statute. This Court may only reduce a sentence under 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court finds either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  (emphasis

added).[3]  As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary."  *United States v. Willis,* 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).  Additionally, even if a defendant meets all the criteria for compassionate release under Section 3582(c)(1)(A)(i), he becomes merely eligible for a sentence modification, not entitled to one.  The Court must also consider the applicable § 3553(a) sentencing factors and United States Sentencing Guideline ("USSG") § 1B1.13(2).

Defendant asserts that his health conditions, combined with the existence of the COVID-19 pandemic, are "extraordinary and compelling" reasons to reduce his sentence.  The Application Notes to United States Sentencing Guideline ("USSG") § 1B1.13 are the "applicable policy statements" referenced in 18 U.S.C. § 3582(c)(1).  There, the Sentencing Commission provided specific examples of what constitutes an "extraordinary and compelling circumstance":

(A)     **Medical Condition of the Defendant**—
   (i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

---

[3] Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release. Specifically, 28 U.S.C. § 994(t) states the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."  The statute also states "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

      (ii)     The defendant is—

           (I)     suffering from a serious physical or medical condition,

           (II)    suffering from a serious functional or cognitive impairment, or

           (III)  experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

. . . .

      (D)    **Other Reasons.**— As determined by the Director Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[4]

USSG § 1B1.13 cmt. n.1.

The existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall within the categories described in USSG § 1B1.13, and therefore cannot by itself provide a basis for a sentence reduction. "General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on

---

[4] This final provision is often called the "catch-all" provision. One court in this District recently discussed how the Sentencing Commission's lack of quorum since the First Step Act was passed arguably impacts whether the policy statement at U.S.S.G. § 1B1.13 still applies. *See United States v. Morehouse*, 2020 WL 2836188, at *1 (D.S.D. June 1, 2020). Specifically, the court noted that "'several district courts have concluded that the discretion vested in the BOP Director under the catch-all provision now belongs coextensively to federal judges.'" *Id.* at 5 (quoting *United States v. Condon*, 2020 WL 2115807, at *3 (D.N.D. May 4, 2020) (additional citations omitted)). The government respectfully submits that the statute's plain language vests the authority to apply this "catch-all" provision solely with the "Director of the Bureau of Prisons."

compassionate release, USSG §1B1.13." *Eberhart*, at *2.  The Third Circuit echoed this principle with respect to an appeal by an inmate at heightened risk for COVID-19 complications due to his age (68) and health conditions (Parkinson's disease, diabetes, and heart issues):

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia.  But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.  *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

*Raia*, 954 F.3d at 957.  Another court's decision within this district relied on this holding in *Raia*.  *United States v. Young Bird,* 3:18-cr-30061-RAL, Doc. 188 at 8 (D.S.D. June 3, 2020).  In *Young Bird*, the court concluded, "[T]here is still much that is unknown about how this virus affects individuals, and this Court cannot say to what extent [defendant's] life is threatened by the existence of COVID-19." *Id.* at 8.  The categories contemplated by USSG § 1B1.13 encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.  Defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release to be granted.  *See United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding the defendant bears the burden of establishing entitlement to sentencing reduction.

As discussed above, this Court generally may not reduce a defendant's sentence unless it finds the existence of "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i) to justify the reduction.  As another court within the District of South Dakota has recently held, the Defendant's sentence may also be reduced if he meets his burden under the "catch-all" provision in USSG § 1B1.13 cmt. n.1(D).  The catch-all provision requires Defendant to establish "extraordinary and compelling reason(s) other than, or in combination with, the reasons described in subdivisions (A) through (C)".  *See United States v. Morehouse*, Case No. 4:18-cr-40019-02-KES, Doc. 121 at 4-6 (D.S.D. June 1, 2020); USSG § 1B1.13 cmt. n.1(D); *see also United States v. Brunston,* 4:18-CR-40145-KES, Doc. 68, at 6-7 (D.S.D. May 26, 2020) (Court considered whether catch-all provision was met and concluded it was not).

## B. DEFENDANT'S OBESITY IS A SERIOUS PHYSICAL CONDITION, BUT HE REMAINS ABLE TO ENGAGE IN SELF-CARE AND SHOULD NOT BE RELEASED.

Defendant claims he has several serious medical or physical conditions, including hypertension, obesity, an enlarged heart, and bradycardia.  Doc. 395 at 2.  BOP Health Services provided a "Health Problems" summary document as part of Defendant's medical records which shows all Defendant's medical conditions.  *See* Doc. 392 at 1-4, 40-41.  Defendant's current medical diagnoses include hyperlipidemia, mixed; hypertension, benign essential; bradycardia (described as "other cardiac dysrhythmia"), and obesity.  *Id.* at 1-4, 10.  Only one of these conditions, obesity, is a condition recognized by the CDC as presenting

any increased risk of complications should Defendant contract COVID-19.[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed July 31, 2020); *see United States v. Morehouse,* 4:18-cr-40019-02-KES, Doc. 121 at 4-6 (D.S.D. June 1, 2020 (listing the health conditions noted by the CDC as posing a particular risk of COVID-19 infection).

In May 2020, the Department of Justice refined its position on compassionate release motions, such that an inmate with a diagnosed medical condition that the CDC has identified as a risk factor for COVID-19 is deemed to have a qualifying "extraordinary and compelling" reason that may warrant compassionate release if other requisite criteria are met. *See, e.g.*, *Williams v. Wilson,* No. 19-A1047, Reply in Support of Application for a Stay, at 18, n.4 (Sup. Ct.) (filed June 4, 2020); *United States v. Pabon*, No. 17-CR-165, 2020 WL 2112265, at *3 (E.D. Pa. May 4, 2020) (noting and agreeing with Government's position). In the instant case, Defendant's obesity qualifies as such a condition under the Department's internal guidance and the CDC's list of qualifying medical and health conditions, and therefore is an "extraordinary and compelling reason" under USSG § 1B1.13(1)(A).

---

[5] Defendant also experiences anxiety, low back pain, and other minor health conditions. Doc. 392 at 10, 31.

Significantly, however, another court within this District recently considered a defendant's obesity and other health conditions, combined with the crowded conditions inherent to incarceration and COVID-19 pandemic, in denying the defendant's motion for compassionate release. *United States v. Saenz*, 3:10-cr-30027-RAL, Doc. 192, at 11 (D.S.D. July 29, 2020). The court wrote:

> It is true that the CDC has recognized that individuals suffering from obesity and who have a body mass index of 30 or higher have an increased risk of developing a severe illness if they contract COVID-19. The CDC however does not list any of Saenz's other diagnosed ailments on its list of underlying medical conditions that place individuals at higher risk. Because COVID-19 is a new disease and so much is still unknown about how it affects individuals, this Court cannot say to what extent Saenz's life is threatened by the existence of COVID-19 in FCI Fort Dix, especially considering the precautions put in place by the BOP to protect him and his fellow inmates. *Id.*

*Id.* (internal citation omitted). Like the inmate in the Saenz case, Defendant is obese, as defined by the CDC. However, none of the Defendant's other medical or physical conditions are included on the CDC's list of ailments that place individuals at higher risk of health complications in the event they contract COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed July 31, 2020). Defendant's hypertension, as opposed to pulmonary hypertension, is not a "serious heart condition" that puts him at higher risk of developing serious illness if he contracts COVID-19. "Serious heart conditions" include pulmonary hypertension, but not general hypertension. *Id.*; *United States v. Nelson,* 2020

WL 2309075, at *4 (W.D. Penn. May 8, 2020) (discussing the difference between pulmonary hypertension and hypertension).

Moreover, Defendant's conditions are well-managed through oral administration of over-the-counter medication. Doc. 392 at 8, 25, 31, 38, 47, 61; *see also Morehouse,* Doc. 121 at 6 (concluding "high bar necessary to warrant a sentence reduction" was not met where inmate's conditions were managed with medication). Defendant's active prescriptions during the last calendar year include Amlodipine (to control blood pressure), aspirin (same), atorvastatin (to control cholesterol), buspirone (for anxiety), and carbamazepine (for low back pain). *Id.* at 6, 8, 25, 47-48. He experiences no adverse side effects from his atorvastatin or amlodipine. *Id.* at 8. Defendant's Presentence Report (PSR) shows his hypertension and hyperlipidemia existed when he was sentenced in 2010. PSR ¶ 36. Prior to his sentencing, Defendant's prescribed medications included Norvasc, Hydrodiuril, and Zocor. *Id.*

Furthermore, Defendant is capable of, and has routinely engaged in, strenuous exercise to control his weight. Defendant's medical records show he has no exercise restrictions. *Id.* at 8 (indicating no exercise intolerance, palpitations, or shortness of breath as of March 13, 2020). Defendant's Individualized Reentry Plan indicates he regularly engages in strenuous cardiovascular exercise, including spinning, calisthenics, walking, treadmill exercise, yoga, and softball. Doc. 390-2 at 4-5. He has no work restrictions or limitations at FCI Englewood and has been cleared to work in food service. Doc.

392 at 111, 725, 726.  Upon release, Defendant has indicated he intends to work for a contracting company and will obtain medical care at an Indian Health Services Hospital.  Doc. 395-1 at 1.  Defendant is well able to provide self-care and has not given any indication his ability to do so has been "substantially diminished" while incarcerated simply because he is obese.  *See, e.g., United States v. Korn,* 2020 WL 1808213 at *5 (W.D.N.Y. Apr. 9, 2020) (denying release where defendant could walk with a cane, dress, bathe, eat and perform activities of daily living, and thus whose ability to provide self-care in the correctional environment was not substantially diminished).

While potential exposure to COVID-19 is not something to take lightly, it simply does not "warrant the release of every federal prisoner with health conditions that make them more susceptible to the disease."  *United States v. Gold*, 2020 WL 2197839, at *1 (N.D. Ill. May 6, 2020) (quoting *United States v. Miller*, 2020 WL 2093370, at *2 (C.D. Ill. May 1, 2020)).  Defendant's circumstances, like those in the Saenz case, are such that, although he is obese, nothing about his obesity, the pandemic, or the conditions of his confinement have prevented him from engaging in self-care to manage his condition.  To the extent Defendant asserts he is unable to exercise self-care in the facility, his assertion is speculative and appears to be based on the conditions of confinement, rather than his condition or combination of conditions.  Moreover, there is no reason to believe Defendant's obesity is a condition "from which he … is not expected to recover."  This is insufficient to justify compassionate

release under USSG § 1B1.13, comment note (1)(A)(ii).  *See Saenz*, 3:10-cr-30027-RAL, Doc. 192, at 10.  Likewise, it fails to satisfy the "catch-all provision" at USSG § 1B1.13 cmt. n.1(D).

### C. THE SECTION 3553(A) FACTORS AND USSG § 1B1.13(2) WEIGH AGAINST DEFENDANT'S RELEASE.

The Court's inquiry does not end at a determination that Defendant's obesity is a "serious physical condition" that constitutes an "extraordinary and compelling reason" to reduce his sentence.  Instead, Defendant's motion must be analyzed in conjunction with 18 U.S.C. § 3553(a) and USSG § 1B1.13(2).  *See* 18 U.S.C. § 3582(c)(1).  The policy statement set forth at USSG § 1B1.13 instructs the Court's analysis of a compassionate release motion.  It prohibits this Court from reducing a defendant's sentence unless the Court determines "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[6]  Additionally, this Court must consider the applicable Section 3553(a) factors as part of its analysis.  *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).  Defendant has failed to demonstrate he is not a danger to the safety of the

---

[6] While district courts disagree about whether the First Step Act alters the binding nature of USSG § 1B1.13, "the limited statutory exceptions to the general rule of finality of judgment" counsels in favor of following the Sentencing Commission's guidance.  *Eberhart*, at \*2; *see also United States v. Willingham*, CR113-010, 2019 WL 6733028, at \*2 (S.D. Ga. Dec. 10, 2019) (collecting cases).  To date, at least one Court within the District of South Dakota has not aligned itself with the *Eberhart* decision.  *See United States v. Morehouse*, Case No. 4:18-cr-40019-02-KES, Doc. 121 (D.S.D. June 1, 2020).

community or otherwise deserves release under the § 3553(a) factors or USSG § 1B1.13(2).

The nature and circumstances of Defendant's crime belie his placement into Criminal History Category I at the time of his sentencing.  Defendant was convicted of engaging Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848(a) and 848(c), a Class A Felony.  He was the organizer, supervisor, and manager of an exceedingly sophisticated, highly organized cocaine trafficking ring. PSR, at p. 3.  Defendant's drug trafficking enterprise spanned *two decades*, beginning in approximately 1998 and continuing through the date of his indictment, in 2008.  In 1998, Defendant began buying quarter pounds of cocaine in Denver, Colorado, and distributing it on the Pine Ridge Reservation. Doc. 240, at 1.  By 2008, he was bringing three-quarters of a kilogram of cocaine to the Pine Ridge Reservation with each trip he made, or that others made on his behalf.  *Id.* at 1-2.

To insulate himself from the blatant nature of the criminal conduct, Defendant generally used his brother and other recruits to transport the cocaine. *Id.* at 2.  Defendant recruited others to "break down" the cocaine into packets for resale, and recruited still others to sell it for him.  *Id.*  Defendant's criminal enterprise continued for so long in part because he personally sold drugs only to people he trusted, and had others conduct the large-scale distributing on his behalf.  Doc. 240, at 3.  He treated his distributors poorly and kept them dependent on him by paying them with very little money or just enough cocaine

to stay high.  PSR ¶ 10.  To further protect himself, he employed family members, including one of his brothers and the mother of five of his children.  PSR ¶¶ 8, 10.  Defendant's criminal sophistication and use of others to carry out the riskiest parts of his drug trafficking ring speak to why he was not personally arrested until 2008.

For purposes of determining Defendant's guidelines range, 16.9 kilograms of cocaine were attributed to him, based on his role in the conspiracy.  PSR at ¶ 12.  Defendant agreed he was personally responsible for at least 15 kilograms of cocaine.  *Id.*  For every ounce of cocaine he sold, he earned between $2,900 and $3,000, which means during the course of his criminal enterprise, Walking Eagle's approximate income was between $1,534,100 and $1,587,000.  Doc. 240, at 3.  At the time of his sentencing, Defendant had spent only five months of his thirty-seven years of life gainfully and legally employed.  PSR ¶ 39.  Moreover, because Defendant's financial straits were the stated impetus for his crime, PSR ¶ 15, he remains at risk to reoffend if he is released.  He is only 47 years old.  He remains a danger to public safety and a risk to reoffend.

Defendant has demonstrated almost no remorse and very little insight regarding the effect his conduct has had on his community, other than to agree with the factual basis statement he signed and apologize to his family.  PSR ¶ 15; Doc. 310 at 12-13.  The negative impact of Defendant's criminal conduct upon the residents of the Pine Ridge Reservation and the District of South Dakota cannot be overstated.  As the prosecuting attorney stated at Defendant's

sentencing, "[w]e will never know the full cost."  Doc. 310 at 21.  As the sentencing court remarked, "...think about all of the other families that were affected by that huge quantity of cocaine that was coming into Pine Ridge." *Id.* at 25.

In addition to the foregoing, a thorough consideration of the § 3553(a) factors strongly disfavor a sentence reduction.  Acting as the ringleader of an ongoing criminal enterprise to distribute kilos of cocaine is a serious crime.  The nature and circumstances of Defendant's conduct do not warrant an additional reduction.  The sentence Defendant received was appropriate for the crime committed, and he has served just 58.8% of his sentence, which was the mandatory minimum sentence he faced.  His crime is categorized as a Class A felony, the most serious felony classification.  Defendant's plea agreement reduced his exposure to twenty years from a potential life sentence, and to one felony conviction, rather than potentially twelve felony convictions.  Reducing Defendant's sentence to time served would fail to deter similar conduct, and would create a substantial and unwarranted sentencing disparity among similarly-situated defendants.  Accordingly, in light of Defendant's crime and the totality of relevant circumstances, even if this Court finds compelling or extraordinary circumstances justifying Defendant's early release, based on his obesity, this Court should deny the motion for a sentence reduction based upon consideration of the § 3553(a) factors and USSG § 1B1.13(2).

### III.   BOP HAS TAKEN SIGNIFICANT MEASURES TO KEEP DEFENDANT AND OTHER SIMILARLY-SITUATED INMATES SAFE.

Defendant has not addressed how BOP's pandemic protocols are insufficient in light of his obesity.  Although there are risks in an institutional setting, BOP has taken significant measures to protect the health of inmates in its charge.  BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  (last accessed July 31, 2020).  That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas."  *Id.* at i.  The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.  Consistent with that plan, BOP began planning for potential coronavirus transmissions in January.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.  On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.

Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.   For example, beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, and on April 13, 2020, BOP implemented Phase Six, which currently governs operations.   The Action Plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease.   Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.   Further, BOP has severely limited the movement of inmates and detainees among its facilities.   Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease.   Likewise, all official staff travel has been cancelled, as has most staff training.   All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

The Action Plan comprises of several additional preventive and mitigation measures, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable.   *See* Federal Bureau of Prisons, BOP Implementing

Modified                    Operations,             *available*                 *at*
https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed July 31,
2020).  All new BOP inmates are screened for COVID-19 symptoms and risk of
exposure.  Asymptomatic inmates with a documented risk of exposure will be
quarantined; symptomatic inmates with documented risk of exposure will be
isolated and tested pursuant to local health authority protocols.  In areas with
sustained community transmission, all facility staff will be screened for self-
reported risk factors and elevated temperatures.  Further details and updates of
BOP's modified operations are available to the public on the BOP website at a
regularly updated resource page:  www.bop.gov/coronavirus/index.jsp (last
accessed July 31, 2020).

Even though the CDC acknowledges certain medical conditions pose an
increased risk factor for COVID-19 complications, courts have held that "the
mere *possibility* of contracting a communicable disease such as COVID-19,
without any showing that the Bureau of Prisons will not or cannot guard against
or treat such a disease, does not constitute an extraordinary or compelling
reason for a sentence reduction under the statutory scheme.  *Korn,* 2020 WL
1808213 at *5-6 (emphasis in original) (citing *Raia,* 2020 WL 1647922 at *2);
*Eberhart,* at *2; *United States v. Zywotko,* Case No. 2:19-cr-113-FtM-60NPM,
2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Gileno,* No. 3:19-
CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) ("'Mr. Gileno
has also not shown that the plan proposed by the Bureau of prisons is

inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno.'"); *United States v. Clark,* 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) ("applying reasoning of *Gileno* and *Eberhart*); *United States v. Gagne,* no. 3:18-cr-242 (VLB), 2020 WL 1640152, at *4 (D. Conn. Apr. 2, 2020) ("denying compassionate release where the defendant failed to show 'that the [Bureau of Prisons] cannot adequately manage the [COVID-19] pandemic or treat her to a reasonable degree'")).

Like *Saenz* and *Korn*, Defendant cannot show the possibility of contracting COVID-19 in connection with his obesity and other health issues are extraordinary or compelling reasons to grant release, given Defendant has failed to show that the BOP "will not or cannot guard against or treat such a disease." Defendant is only 47.  He has not been placed at a medical facility, further indicating his physical condition is well-managed and not severe.  *See also United States v. Godofsky,* 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (denying release for 63 year-old inmate with high blood pressure, high cholesterol, asthma, and taking medication that weakened his immunity system, finding that "even in the context of the ongoing public health crisis," inmate's circumstances do not present an extraordinary or compelling circumstance); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denying compassionate release for 66-year-old man who is obese and has heart disease

and high blood pressure, requiring inmate to show "more than a mere speculation of the possibility of contracting the virus.").

BOP is making continued efforts to work to contain the virus.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted.  *See, e.g.*, *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases).  Despite the severity of the COVID-19 pandemic, Defendant's situation is not one of those rare cases.

## IV.   IF THE COURT REDUCES DEFENDANT'S SENTENCE, IT SHOULD DO SO WITH STRICT AND SPECIFIC LIMITATIONS.

If the Court is inclined to grant Defendant's motion for compassionate release, the United States respectfully urges the Court to substitute a term of supervised release with a condition of home confinement for the duration of Defendant's current sentence of imprisonment.  The government submits that releasing Defendant outright would not appropriately re-balance the § 3553 factors of this case, particularly given that the present conditions caused by the pandemic are likely impermanent—public reporting indicates that various medical professionals globally are in the process of developing a vaccine and researching other methods of combatting the disease in the coming months.  *See, e.g.*,       https://www.nih.gov/news-events/news-releases/nih-clinical-trial-investigational-vaccine-covid-19-begins (last accessed June 8, 2020).  Moreover, there is no indication Defendant's obesity is permanent.  In order to minimize

risks to public health, the government also respectfully requests that if the Court orders release, (1) any order grant Defendant's release only after his release and travel plans are in place, and (2) set any release 14 days from the date of its order to accommodate BOP's ability to quarantine Defendant prior to his release to protect the community from potential further spread.

### CONCLUSION

Based upon the foregoing argument and authority, Defendant's motion for compassionate release should be denied.

Respectfully submitted this 31st day of July, 2020.

RONALD A. PARSONS, JR.
United States Attorney

 /s/ Heather C. Sazama
HEATHER C. SAZAMA
Assistant United States Attorney
515 9th Street, Room 201
Rapid City, South Dakota 57701
(605) 342-7822
Heather.Sazama@usdoj.gov